Take the matter under advisement. We'll let Judge Roth listen to this long disc and get back to us. Thank you. We'll hear the Jones case next. Thank you. See, they're all here. Yeah. Happens all the time. Right. In the Ninth Circuit. Oh, yeah. No doubt. But we do have vacations. Your audience has left. Much of your audience. But we're here. Good morning, Your Honor. Good morning, Ms. Merriweather. May it please the Court, my name is Ellen Merriweather, Counsel for Plaintiffs Appellants. You'll have to speak closer to the mic and up so that we get everything that you say. How does that sound? That's fine with me. Hopefully it will be fine with Judge Roth.  Granted. The court below erred in dismissing the complaint without leave to amend because the facts alleged plausibly suggest that Mr. Schneider was acting as the servicer for the defendants with respect to the closing and servicing of the loans of the Joneses and the other victims, the other homeowners victimized by the Ponzi scheme. When you say he was acting as a servicer, I mean, servicer, like, doesn't have to be appointed by the mortgagee or, you know, in the agreement or anything like that? Your Honor, no, it is not. I can just go in and start servicing a loan? Well, under RESPA, RESPA defines the servicer as the person responsible for collecting the payments of principal and interest on the loan, and then the person paying, remitting the payments of principal and interest on the loan. It does not define servicer in the terms of anything other than the actual conduct in performing these tasks. That is exactly what Mr. Schneider did in this case, and he meets the definition of servicer under RESPA, as well as the definition of the lender's agents under common law. And for me to be able to explain this, Your Honor, I would like to be able to briefly describe the Ponzi scheme that's at issue here. The story begins with the equity slide-down discount program that Mr. Schneider ran from his mortgage brokerage company, OPFM. Mr. Schneider was a licensed mortgage broker operating for almost 20 years. His mailing address was Post Office Box 144, OVPA. In operating for that long, Mr. Schneider had a substantial business relationship with the lenders who were funding these loans. When the homeowners approached Mr. Schneider... What was that relationship? I said substantial. Yes, you said substantial, but what was it? Mr. Schneider was the broker and the originator for, for instance, Defendant's Son Trust that funded 178 of these equity slide-down loans. While, of course, we haven't had discovery into the exact contractual relationship, we know that that business relationship was quite substantial. 178 times, Son Trust, for example, provided the funds that were then later converted by Mr. Schneider into the equity slide-down program, and it's that that I need, that I think I would like Your Honors to understand. Mr. Schneider described the program in a letter to the homeowners, and that letter is contained in the appendix at page 1348. Did a copy of that go to the lenders? Your Honor, no, I don't believe it did. And you're trying to hold the lenders. Yes, Your Honor, and I'll tell you why. What did the lenders do to appoint Mr. Schneider? I'd like to answer that question, Your Honor. Sure, good, I asked it. I think it's a very important question. Oh, you can go ahead. I think there's two levels to that. It's what Mr. Schneider told the borrowers and what they believed he was doing, and then what the lenders did. Yeah, let's stick to the lenders, because you're suing the lenders, so what did the lenders do? Your Honor, just to be clear, we have not had discovery in this contract. We understand that, but what did the lenders do? One of the funding lenders, Son Trust. What do you claim in your complaint? There's two levels of analysis here. One is what the lenders did with respect to the actual funding process. The borrowers believed, when Mr. Schneider said he was going to arrange to convert the loan, that Mr. Schneider was working with the lenders in doing this. And that was reasonable because why not? Excuse me. Did the lenders give the Joneses or the borrowers any indication that Mr. Schneider was working for them? Yes. How? Okay. If you will look at page 1359 of the appendix, you will see a form letter that Son Trust sent directly to the borrowers. Which says? Which says that Mr. Schneider is our agent? No, it says that the form letter, we believe it was sent to all of the lenders, all of the borrowers that were originated through Son Trust. And it says that federal truth in lending, federal government regulations require Son Trust mortgage to disclose this information within three business days of the receipt of your loan from personal financial management as a potential lender. I'm sorry. What Son Trust is doing is Wait, wait, wait. That's the letter that Son Trust sent. To the borrowers. To the borrowers. I'm sorry. I didn't hear anything in there about Mr. Schneider. Mr. Schneider is personal financial management. Yeah, but What Son Trust is designating is clothing Mr. Schneider with the mantle of authority as their lender. And that dovetails exactly with what Mr. Schneider told the borrowers to do. What language says that? It says federal regulations require Son Trust mortgage to disclose this information to you within three business days of receipt of your loan from personal financial management. Personal financial management wasn't a lender. Son Trust called personal financial management a lender. It also said, the third paragraph of this letter, should you have any questions regarding the enclosed information, and the enclosed information is the truth in lending disclosures and also the service and transfer disclosures, please contact personal financial management. So what this letter does is, in the origination process, it clothes Mr. Schneider, who was a mortgage broker, with the mantle of lender. Because it calls him your potential lender. So when Mr. Schneider tells the borrowers And tell us again what page that's on. That's on page 1359. So when Mr. Schneider tells the borrowers that he is going to, quote, arrange to convert the loan, who is that arrangement being made with? It's being made with the funding lender. And the funding lender, in this case, Son Trust, has clothed Mr. Schneider with the authority to be a lender and to be the person with whom the borrowers can consult with respect to disclosures, including truth in lending disclosures and transferring disclosures. So now we have Mr. Schneider and his brokerage company that's not a lender being clothed with the mantle of authority by a lender as part of this loan process. So what Mr. Schneider says is, I will arrange to convert your loan. What does that mean, arrange with whom? Arrange with the lender, the only lender that there is, in this case, Son Trust. I will arrange to convert the loan. And how does that arrangement, how does that conversion happen? It happens through a large prepayment of principal right up front called the wrap payment. And these prepayments were substantial. They were between 25% and 30% of the loan balances often. The Joneses, in fact, paid $70,000 in prepayment. And what Mr. Schneider did in the second step of this closing of this loan was he showed the borrowers' documents, showing them that those prepayments were deducted from the loan balance. And he did this by providing amortization schedules, which showed the reduction of the loan balance. And I can give you those pages if you would like, Your Honors. Also, he showed this by giving them truth in lending disclosures that showed the deduction of the balance of the prepayments from the loan balance. So... Tell me how this, you know, how the Schneider scheme worked. Now, what, the borrower, let's say like Jones, did the borrower got a loan from somebody like Son Trust? Your Honor, if you look... That's step one, is that right? Yes. And then step two, what? Step two, Mr. Schneider arranged to convert the loan in a letter that's in the appendix of 1348. Into that slide there? And the conversion comes by the Joneses paying the RAT payment, which then Mr. Schneider shows as a reduction of the principal balance by the amount of the RAT. So what he was telling them is that by making this large upfront prepayment of principal, you'll reduce your balance and you'll get a lower interest rate and the combination of those two things will give you a lower monthly payment. All right. Now, so for a while at least, the borrower did actually get a lower monthly payment? Well, not if you consider the upfront prepayment. The borrower's all paid more. What I'm getting at, so the borrower had a smaller monthly payment? Yes. So the borrower, right, paid that money to Schneider. That's correct. Did Schneider pay any money to SunTrust? Schneider paid the correct loan amount to SunTrust, referencing the SunTrust loan. The original loan amount. The original loan amount, that's right. That the borrower took from SunTrust. Yes, and let me explain to you how that happened. To those who participated in this equity slide-down discount program, Mr. Schneider sent a letter and said, because you're participating in this program, we will be maintaining the servicing of your loan. And then what he did is he sent them documents for them to fill out so that he could carry out these duties. Well, he's doing, Schneider there is obviously doing something different than what an ordinary servicer does, right? Well, to the extent that he's retaining the money and not paying it through, we would hope that servicers generally abide by their duties and responsibilities. But there is no – No, it's not just that. But, you know, I mean, he created this different mechanism, gave the borrower a different loan, right? I would say no, Your Honor. I'd say there's only one loan. There's only one loan. There was one set of money that was advanced from a lender. Schneider's not a lender. He did not lend any money. He took money. He took money back from the borrowers and did so with the representation that what I'm doing is I'm going to take this – But, for instance, when he took this lump sum, I'll call it, up front – The prepayment. From the borrower. Yes. He didn't send that to SunTrust. No, that's right. And what he did with that, now we know, now the borrowers thought he was paying down the loan with it, but now we know what he did was he commingled that into the Ponzi scheme with the big pile of money from all the other borrowers and then paid the lender's loans from the commingled funds of the Ponzi scheme. Now, my question is, I mean, even assuming a person can become a servicer, you know, without being appointed by the mortgagee, even assuming that could happen, this is not the kind of situation where a person is a servicer, is it? Your Honor, I think that if you look right at the statutory definition of servicer, Mr. Schneider fits within that role because that's the conduct that he was performing. He was collecting the principal and interest payments on the only loans that there were. There were only one – there was only one loan, and paying principal and interest on the only loans that there were. Now, the fact that he was collecting the wrong amount, the fact that he retained repayments and didn't send them through. Could I follow up on Judge Tichini's questions because I don't understand stuff? What did the Joneses – let's talk only about the Joneses because they're the only parties that we have here. Did they sign two separate documents? Did they sign something with the original lender? And did they then sign a document, a mortgage with Mr. Schneider? Yes, they did, Your Honor. Oh, so there are two documents. There's the original document, and then they knowingly signed another mortgage this time with Mr. Schneider. Is that right? Is that what – I just want a yes or no on that. Your Honor, no. I mean, they didn't sign – They signed both documents. You said knowingly. Knowingly signed another note with Mr. Schneider. Well, knowingly. I mean, they signed a second document, and this took the place of the first mortgage with the lender. They believed, I guess. What they believed – I'm asking what they signed. They signed a note and a mortgage with Mr. Schneider. They signed it. Which was, in their view, because this was the representation made, a conversion of the original note. Okay, so they signed two documents, but the lender had nothing to do with the second document. That was a Schneider document. That was a Schneider document. But the question is, we're not willing to concede. We don't know, prior to having any discovery taking place, what the lender actually knew. But I will tell you what we do know. We know that the funding lenders provided money multiple, multiple times. SunTrust, 178 times they provided money that was later converted by Schneider. The Joneses? We're talking only about the Joneses. I'm talking – but I'm answering the question about what the lenders knew. Yes. Or didn't know. No, I didn't ask you what the lenders knew. I asked you what the Joneses signed. And the Joneses signed first a mortgage with the lender, capital L in the briefs. Yes. And then they signed a mortgage with Schneider. That's correct, Your Honor. That's all I – yeah. All right. So – And the mortgage with Schneider didn't – wasn't signed by or referred to the original lender. Is that right? It did refer to the original lender. It was not signed by the original lender. It did what with the original lender? It did refer to the original lender. Oh, what did it say? It talked about a first mortgage with respect to the original lender. I see. But, Your Honor, here's something that I think is very important. Mr. Schneider usurped the servicing function by getting the borrowers – He's in jail for 12 years. I know. I mean, he's bad. Yes. He got the borrowers to sign a letter that required all notices with respect to the loan to be made to his brokerage firm business, Post Office Box 144, all EPA. And with respect to the funding lenders, for instance, SunTrust, 178 times they received – Let me ask you this. Is it under the law, under RESPA, is it possible for a person to become a servicer of a loan without the knowledge of the lender? I think that the definitions of RESPA provide for that eventuality. But I would also say we don't rely only on RESPA. We rely on basic common law agency principles, which, in the broker-lender context, is very fact-specific and addressed to the question of whether or not the broker did more than simply bring the borrower and the lender together. And we believe that the cases that we've cited in our brief, particularly the Poskin case, which discusses many others, sets a standard that Mr. Schneider certainly met, at least on a pre-discovery record. Well, was Schneider the broker on this loan? Yes, he was. In other words – It doesn't hurt. We don't need anything from – In other words, he brought the Joneses and the SunTrust together? Correct. All right. So he's the broker on the loan. He has a contractual relationship with SunTrust, which, although we have not had discovery on this, required that he not retain any interest in the loans, including servicing. But nevertheless, for 178-plus loans, SunTrust receives a letter telling SunTrust to communicate with the borrower at the broker's address, Post Office Box 144, OLEPA, 178 times. Now, do we know what SunTrust did when it got that? Do we know whether or not they thought that was odd? Do we know whether or not they ever discussed it with Schneider? We don't know any of those things. What we do know is that is a sufficient red flag to put SunTrust at least on notice that something is gravely amiss when every single piece of paper for 178 different loans is going to a Post Office Box – We're talking about one loan. We're talking about one – What? We're talking about the Joneses. There's been no class action granted here, right? Your Honor, yes, but we're also talking about what SunTrust was reasonable in knowing or not knowing, and the fact that this occurs repeatedly not only establishes that they have a substantial business relationship with Schneider, but also is an additional red flag. Thank you, Ms. Merriweather. Your time is up. Beautiful, Huffington. I'll get you back on rebuttal. Good morning, Your Honors. Martin Bryce for Appellees, SunTrust, Wells Fargo, and Countrywide. I'd like to start by putting this in a little bit of context for you, if you'll bear with me. What the Joneses and, for that matter, the putative class were doing was paying substantially less on the mortgage loans they had with our clients, and they were doing that pursuant to Mr. Schneider's equity-wrapped product. As a result, when the Schneider entity ceased functioning, they were digging themselves a hole. They were paying less than what they owed under our legitimate mortgages, and to that end they sought a TRO in state court and a preliminary injunction before Judge Giles. Every day they didn't make the required payment to us. They dug that hole deeper, recognizing the Joneses' predicament and recognizing the fact that there was a putative class out there who was arguably not honoring their legitimate commitments pursuant to our loan documents. Judge Giles spent an extraordinary amount of time on this matter, exploring every aspect of the plaintiff's case. He held five oral arguments on this. He gave plaintiffs every opportunity to get it right. Their original complaint filed in state court seeks rescission of our loans, contending our loans are void. It brings a fraud count. They eventually file an amended complaint and a second amended complaint, completely recasting the case. First they started by accusing us of being active participants, their terms. They dropped that. Why don't we focus on what we have now, not on what they had before? I'm happy to. I just want to mention one thing, if I can, Your Honor. Judge Giles, in a hearing at the oral argument on the 24th of October, nearly a month before they filed their second amended complaint, said to them, quote, You should take whatever time you really need to make sure that you've included everything that you want to include and that you excise that which you don't want to ride on. Ms. Merriweather responded to Judge Giles saying we would take a very good, hard look at the facts. Now what happened here? They ended up representing 38 plaintiffs, which itself represented 25 loans. That's what they filed. But we're only talking about, I mean, I kept her to talk about the loans. You have to go by the same rules. Oh, agreed, Your Honor. But the point I want to make is they had access to those 38 plaintiffs. They had access to those loan files. One of their counsel, Mr. Cain, before Judge Giles, at a November 1907 oral argument, expressly says, The borrowers themselves are competent witnesses on the overall transaction. Mr. Price, didn't your clients realize that the money that they were getting, the monthly money, was coming from Mr. Snyder? No, absolutely not, Your Honor. You mean the checks didn't come from Snyder? Did the checks come directly from the Joneses? The allegation is that the checks came from Mr. Snyder, and they attempt to use that allegation to – All right, but wait. When I asked you whether the checks were coming from Mr. Snyder, I thought you said no, and now you said yes. Now, your clients are the bankers. Correct, Your Honor. Okay, and they get checks from the mortgagee, right? Ordinarily. Ordinarily, they get checks from their borrowers, yes. On behalf of the mortgagee. And were these checks in the amount required under the mortgage? The checks from Mr. Snyder, as a general matter, were in the amount required under the mortgage, yes. That, however, neither makes Mr. Snyder a servicer, nor does it make him a lender. A lender, excuse me, an agent. I thought the statute suggests that the act of servicing can make somebody a servicer even if the somebody doesn't have a statement by the lender that he or it is a – is that right? Am I wrong? No, Your Honor. What RESPA provides is that the servicer is the entity that receives scheduled periodic payments from a borrower pursuant to the terms of the loan. And when you parse that, number one, Mr. Snyder was obviously not our borrower. Number two, he received payments from the borrowers, but those payments were not in the amounts required under our loan documents. What they were were in the amounts required under the separate loan documents he had executed with the borrowers. Okay, so then you're – let's say the bank. Was the bank getting a lesser amount per month on the mortgage than the mortgage provided? No, it was not, Your Honor. So if the mortgage provided you pay $512 a month, the bank was getting $512 a month? Correct. But that fact does not turn Mr. Snyder into a servicer because that's not the term that the statute uses. A servicer, again, is the entity that receives from the borrower the scheduled periodic payment pursuant to the terms of the loan. Where does it say that? That's 12 U.S.C. section 2605, little i, paragraphs 2 and 3, Your Honor. All right, 2605. 2605, paragraph i, subsection 2 and 3. I, 2 and 3. And we cite that repeatedly in our brief. All right, 2605. And it speaks of those three things. Now, Mr. Snyder was receiving payments from his borrowers, from the borrowers, excuse me. But those payments weren't the amount that was being paid to us. They were a lesser amount. That was the whole point of the scheme. So he doesn't qualify under that statute. And the fact that he was paying us the full amount can't turn him into a servicer. Well, I thought you just said he was paying less. That's why I'm not clear. Let me tell you exactly this way, Your Honor. Let me just ask it so that I can understand it. Yes. Under the mortgage with your clients, the Joneses have to pay a set amount per month, right? Correct. I don't know how much that was. Let's pretend it was $512. Were your clients receiving $512 a month? Yes. Okay. So they weren't receiving a lesser amount. No. My clients weren't. I thought you just said they were. I'm sorry. No, it was Mr. Snyder who was receiving the lesser amounts, Your Honor. And he made up the difference? Correct. And he paid the banks the amount that was due? Correct. So, I mean, to use the Joneses as an example, pursuant to their equity wrap agreement with Snyder, they were paying Snyder $897.01 a month. Pursuant to their mortgage loan documents with SunTrust, they were obligated to pay $1203.48 a month. So they sent the lesser amount to Mr. Snyder. Mr. Snyder then added on and sent the full amount to us. Now, what RESPA requires you to do, requires us to do is look, who was receiving the scheduled periodic payment from the borrower pursuant to the terms of the loan? That was not Snyder because Snyder was not receiving the $1203.48. He was getting a lower amount. The lower amount he was getting wasn't called for by our loan documents. It was called for by his separate documents with the borrowers. So just a minute. So the way you interpret this phrase in I-3, term servicing means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan. Any loan means the loan from SunTrust to the Joneses. It means the loan that you're contending is being serviced. It doesn't mean the loan from Snyder. No, because the loan they're contending that Snyder was servicing was our loan. So what you have to look at is what are the terms of our loan. And let me show you by reference to the documents, Your Honor. If you look, and there's no dispute about the authenticity of these documents. Page 693 of the record is the note between SunTrust and the Joneses. And that's for $119,000. And that requires monthly payments of $1,291.46. That's what that note requires. Now, if you flip then further in the appendix to page 1340, that document is labeled mortgage note. And that is the document the Joneses executed. I'm sorry, what page was that? 1340. Okay, go ahead. That's the document the Joneses executed three days later. It's also in the amount of $119,000. But this document requires payments of $806.44. So what would happen is the Joneses would make. I'm sorry, it was a payment of what? $806.44. Okay. What would happen is the Joneses would make the payments of $806.44. They weren't, and they would make that payment to Schneider. They were not, most certainly, and there's no allegation to the contrary, but could there be? They were not making that payment pursuant to our note, page 693. They were making that payment pursuant to page 1340, their separate,  mortgage note that they signed with Schneider. You hear Ms. Mayweather's argument. She said there was not a second loan. Well, that's wrong. There were two separate transactions here. And, again, it's in the document. Well, there was maybe two separate transactions, but not a second loan. Well, did the Joneses receive a second check, so to speak, for $119,000? No. No. In that sense, it was not a loan. But it was a separate, subsequent transaction, and that's on the face of the documents that they do not dispute the authenticity of. And what you'll see, Your Honor, is, for instance — And that's what, you know, in shorthand referred to as a slide-down mortgage. Exactly. And, for instance, the prior page in the appendix, 1339, is what Schneider termed a federal loan disclosure, and it's a truth-in-lending disclosure for his $119,000 transaction. There's a separate mortgage that Schneider would have them execute. It wouldn't be filed with respect to their transactions. And Ms. Mayweather made a veiled reference to it. An example of such a mortgage appears at page 1049 of the appendix. And what the Schneider mortgage would say, and this is paragraphs 18 and 19, it would reference the first legitimate mortgage and say it continues in force. That's what it would say. But the Joneses would operate and would make their payments to Schneider, not pursuant to our documents, because if they were following our documents, they would have been making the higher payment, the 1296.46 I referenced from page 693 of the record. They instead were making the lower payment called for page 1340 of the record, which is the second subsequent document they entered into with Schneider. That's how this operated. Now, that can't make Schneider our agent. It can't make him our servicer. As I said, it can't make him our servicer because what they contend he was servicing isn't his loan, which called for the lower payment amount. It's our loan, which called for the higher payment amount and called for that payment amount to be paid to us. I thought that their position was, and I can be wrong, that because Schneider was paying to SunTrust the amount due under the mortgage, SunTrust knew that Schneider was, in fact, acting on behalf of Jones to pay the mortgage and therefore was servicing the mortgage. At least I thought that was their position. Why is that wrong? Well, first, Your Honor, two things about that. Number one, I think that goes to the agency point because there's simply nothing in the language of RESPA that says simply because we receive a payment from him in any amount, that makes him our servicer. And let me give you an example. I could leave here today and set up an automatic bill payment with my bank, saying on the first of the month, pay my mortgage company the full amount owed. I don't think anybody would say that when my bank starts doing that to my mortgage company, my bank has automatically became my servicer. I could leave here today, visit my broker. That's not a bad argument. Yeah, I was going to say, why not? Well, because that's not what RESPA entails. There's a lot involved in servicing. I could leave here today, Your Honors, visit my elderly parents, and establish a practice where once a month I go to their home and I make their mortgage payment for them. Would anybody argue I've become their servicer? If I ask my accountant or my financial advisor, they should do the same. If the bank knew or was on notice that Schneider was paying this, does that have an effect as to whether he was the servicer? I mean, over the years, they were taking the money from Schneider. They knew somebody in the bank knew, a clerical person, that Schneider was paying it. Well, a couple of points about that. One, there's nothing in the language of RESPA that allows for that. Two, with respect to their agency argument, which is, I think, where that really comes up, they ignore their own allegations and statements. And their allegations and their statements of Judge Giles were plainly that the borrowers chose to deal with Schneider. The borrowers sought out Schneider. The borrowers hired Schneider. Well, apparently he sought them out rather than the borrowers. Well, Mr. Wilner, at one of Judge Giles' oral arguments, referring to the Joneses, expressly says, and this is page 1179 of the record, quote, they, referring to the Joneses, they went and were shopping for mortgage loans, and that's when they met Mr. Schneider and his image masters. That's what Mr. Wilner said before Judge Giles. Well, because he was actually the broker from what you told us. He was a broker for SunTrust. I mean, on the SunTrust, on the legitimate mortgage, let's say. Well, he could have, yes. But, again, it's important. They sought out Schneider. They started dealing with Schneider as their broker. They didn't have to do that. There's no allegation that we referred them to Schneider or said, you must deal with Schneider in order to get a loan from us. Consistent with that, up until they filed their briefs in this court, they repeatedly referenced in all of their complaints and repeatedly stated before Judge Giles that the borrowers were ignorant of the lenders. The borrowers had no idea we existed. Repeatedly they said that. Mr. Farina, at the 10-2407 oral argument on page 323, states, the Joneses never had any contact with any bank. A month later, Mr. Cain, page 554 of the record, says, the borrowers never dealt directly with the lenders. I could go on and on where they made statements like that. And, in fact, with respect to the payments, Your Honors, what happened is, and, again, this is in their complaint, and they also conceded this, at the second subsequent closing, when they entered into the Schneider documents, Schneider directed them. We didn't direct them. Schneider directed them, and they signed documents. I think his name is Schneider, not Schneider. Am I wrong? I'm not sure, Your Honor. I've never met the man. Well, what is a choke? Who's the one who's in jail? That's Schneider, Your Honor. Schneider. Schneider, yes, Your Honor. Okay, let's call him Schneider then. They signed documents at his request requiring us to send all of their statements, 1098 forms, et cetera, to him. And that's what was done at their request. And their mortgages with us allowed them to do that. That's standard language. That's what they did. That was done at their direction. They then chose, pursuant to their separate documents that they signed with Schneider, to send their lesser payments to him. That conduct cannot make him our agent. And let me give you an example, Your Honor. I could leave this courtroom today. No matter how convincing I am, no matter what I say, no matter what documents I concoct, I can't leave this courtroom and make myself this court's agent. I just can't do it. The court would need to do something that would allow, either verbally or by conduct, a third party to consider me the court's agent. Thank you. And they haven't, if I can very briefly say, Your Honor. The red light is on. I know. If I can very briefly say, Your Honor, they haven't established that. They haven't alleged that conduct. They haven't demonstrated it. I think you've made that clear in your brief. Yes. If I may make one. No, I really think, we've been here a long time. I think I'm going to stick to the red light. Thank you very much. Well, how long does she have? Three minutes. Okay. We'll keep you to that. Thank you, Your Honor. Yes. Mr. Bryce said that he could go to a bill-paying service tomorrow and direct them to pay his mortgage, and that wouldn't be the servicer. And that's correct. But that's not what Snyder did. Snyder not only paid all of the principal and interest on the loans. He also received all of the communications from the lenders on the loans. And he received it under circumstance. Apparently, that was at the direction of the borrower. May I show you the direction that he's speaking of? Your Honor, that's at the – in the appendix at page 608, and then the next page, 610. There are – this was the clever part of the scheme. This was how Snyder usurped the servicing role. He had the borrowers fill out this blank change-of-address form, directing that all of the correspondence be sent to a post office box in Oldie, Pennsylvania, on every single solitary loan for 15 years, a post office box, the same post office box of the broker. So this is not merely that a bill-paying service was making the payments. This was that all the communications to the borrowers were coming to the broker's address, a post office box, highly suspicious. Not only that, Snyder provided amortization schedules. Snyder provided the borrowers with the 1098s. Snyder did everything that any normal person would believe a servicer was doing. And I think, if Your Honors look closely at RESPA, there was nothing within that statute that would hold immune a servicer that collects the wrong amount, that skims money from the amounts collected and doesn't forward it to the lender. Mr. Bryce's characterization of these loans as the fact that the borrowers were paying less is just wrong. It's wrong on the complaint, and it's wrong in fact. The borrowers are claimants and bankrupt. What about his interpretation, though, of the term servicing in RESPA? He says to meet that servicing requirement, Snyder has to receive the scheduled payments pursuant to the terms of the loan from SunTrust. It says pursuant to the terms of any loan. But any loan means the loan that's the subject of the RESPA. Yes, Your Honor. And that's the loan from SunTrust. And he didn't receive those amounts. No, Your Honor. I would say no, because what Mr. Snyder did was convert the loan. He didn't change the loan. He didn't give a new loan. I know that. But a servicer doesn't have the authority to convert a loan. I know, Your Honor. He doesn't, but he did do that. By that, that would say he's not a servicer. Your Honor, he did that in his capacity as the broker. He was the mortgage broker working with the lenders with whom he said he would arrange to convert the loan. So there's only one loan. No, that's not right. I think that is right, Your Honor. He says there are two loans. There are two loans. We saw two documents. There may be two signed documents, but there's only one loan. There's one loan. There's one lending of money. Just a minute. I mean, there could be a loan without cash being advanced, right? Mr. Snyder was not a lender. He was not licensed to be a lender. He had no money. He gave no money. All he did was take money. He was not a lender. Even though SunTrust clothed him with that mantle in correspondence to the borrowers referring to OPFM as your potential lender. Okay. Thank you. Thank you. As I have said before, we will listen to the disk, send it to Judge Roth, confer with her, and decide the matter. Thank you all. Yes, thank you. Thank you, Your Honor. Thank you, Your Honor. Uh-oh. My keys. Yeah, they're here. Thank you very much. Thank you.